**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT D. PIERCE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 11 C 447** |
| **v.** | ) | |
| | ) | **Magistrate Judge Morton Denlow** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Robert Pierce ("Plaintiff" or "Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") by finding Claimant not disabled through Claimant's date last insured date, but finding Claimant disabled beginning after that date. Claimant raises the following issues: (1) whether the ALJ erred in not soliciting medical expert testimony to infer the onset date of disability pursuant to SSR 83-20 and to determine whether Claimant's impairments in combination medically equaled a listed impairment; and (2) whether the ALJ properly evaluated the credibility of Claimant's testimony. For the following reasons, the Court grants Claimant's motion for summary judgment to reverse and remand the decision of the Commissioner, denies the Commissioner's motion to affirm the Commissioner's decision, and remands the case to the Commissioner for further proceedings consistent with this opinion.

# I. BACKGROUND FACTS

## A.      Procedural History

Claimant initially applied for DIB and Supplemental Security Income ("SSI") on December 11 , 2006, alleging a disability onset date of May 1, 2006.  R. 182-86, 187-89. The Social Security Administrator ("SSA") denied his applications on February 15, 2007. R. 112-15.  Claimant then filed a request for reconsideration, which the SSA denied on July 20, 2007.  123-25, 129-33.  Shortly thereafter, Claimant requested a hearing before an ALJ. R. 135-36. .

On October 23, 2008, Administrative Law Judge Helen Cropper ("ALJ") presided over a hearing at which Claimant appeared with his attorney, Matthew Edwards.  R. 94.  In addition to Claimant, Dr. Elise Torczynski, a medical expert (ophthalmologist), and Frank Mendrick, a vocational expert, also testified.   On April 16, 2009, the ALJ issued a partially favorable decision finding (1) Claimant not disabled through December 31, 2007, his date last insured for DIB under the Social Security Act; and (2) Claimant disabled as of February 1, 2008 through the date of the hearing for purposes of SSI.  R. 88-108.  This decision effectively approved Claimant for SSI but denied his application for DIB.

Claimant then filed for review of the ALJ's decision to the Appeals Council. R. 84-87. On December 17, 2009, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  R. 1-3.  Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

## B.      Hearing Testimony - October 23, 2008

1.    **Robert D. Pierce – Claimant**

At the time of the hearing, Claimant was thirty-seven years old and single.  R. 10-11.

Claimant completed education through the twelfth grade and later earned a certificate in

electrical maintenance.  R. 12.  Claimant's most recent employment as an apartment building

janitor ended in June 2006 when he was laid off for reasons unrelated to his disability.  R.

13-15.  He did not experience any trouble performing duties such as cutting the grass, pulling

garbage, mopping and vacuuming hallways, and cleaning laundry rooms.  R. 14.  Claimant

received unemployment and looked for a janitorial job for approximately six months

thereafter.  R. 15-16.  Claimant's prior work experience included hotel housekeeping, laundry

sorting, and unarmed security guard positions.  R. 16-20.

Claimant is diagnosed with sarcoidosis, a disease which causes the growth of clumps

of inflammatory cells throughout the body.[1]  R. 21-40.  Claimant's symptoms related to

sarcoidosis include: periodic painful swelling of the joints in his hands and knees; swelling

and damage to his eyes that has decreased his vision; reduced lung capacity; and skin

disorders.  R. 21-27.  Claimant testified that after performing basic daily tasks (dressing and

bathing) it is difficult to bend his fingers.  R. 35.  On a typical day, he goes walking to try to

find work and try and get himself back in shape.  R. 29.

On a scale of one to ten, Claimant rated the pain in his fingers as a 5/10 after bathing

_____

[1] "Sarcoidosis is an inflammatory disease.  It starts as tiny, grain-like lumps called granulomas, which most often appear in [the] lungs or lymph nodes.  They can clump together and form larger lumps that attack other organs. Sarcoidosis often affects [the] skin, eyes or liver.  Sarcoidosis may be mild, or it can be severe and do lasting damage.  It does not always cause symptoms [and symptoms] vary, depending on which organs are affected." National Institutes of Health, MedlinePlus, http://www.nlm.nih.gov/medlineplus/sarcoidosis.html.

and dressing himself and the pain in his eyes as an 8/10, noting that it is hard for him to focus visually. R. 35. When he must visually focus on one thing for an hour, he gets dizzy and has headaches. R. 35-36. He has headaches approximately every other day which last for two to three hours and require him to lie down. R. 36-37.

Claimant stated that he can walk between half a block and a block comfortably, he can stand for twenty to twenty-five minutes without walking around, he can sit for twenty to thirty minutes before his knees ache and he then needs to stretch for fifteen to twenty minutes. R. 31-32. He estimated he could lift around forty-five to fifty pounds, but not at a fast pace. R. 31, 33. Claimant testified that he does his own cooking, dishes, and laundry, and is able to bathe and care for himself, but afterwards the joints in his fingers cause pain. R. 30, 32.

His medications at the time of the hearing included prescription eye drops, pills, creams, and inhalers to reduce swelling. He claims his condition has deteriorated since 2006 both in terms of his vision, joint pain, and problems with his lungs. R. 38-40. He testified that his hands were not swollen when he saw a state agency doctor. R. 40. Although he had gone to the University of Illinois at Chicago hospital in 2006, his "money ran out" after he lost his last job, and he believes he began going to free clinics in late 2006. R. 44.

1

### 2. Dr. Elise Torzynski – Medical Expert ("ME")

Dr. Elise Torzynski, an ophthalmologist, testified as a medical expert. The ME stated

that although Claimant suffers from impairments, he does not qualify for any listings. R. 48-49. She explained that Claimant suffers from "chronic inflammation in his eye" and has "clumps of inflammatory cells on the back of the cornea, and then flare is associated with that." Claimant also has mild cataracts. R. 49.

The ME testified that under listing § 2.02, Impairment of Visual Acuity, Claimant's visual acuity in his better eye—his right eye—was 20/100 based on records of a January 2008 eye exam, which "lists in the ratings as 50 percent," while "the standard is 20 percent so he has not dropped to the standard." R. 48, 54-55. She also noted that under listing § 2.03, Contraction of Peripheral Visual Fields in the Better Eye, the medical records "indicate that he has limitation in vision in his right eye, but he doesn't totally meet that standard . . . [because t]here's no indication in the report that he has any limitation on his visual field." R. 48-49. Finally, the ME noted that listing § 2.04, Loss of Visual Efficiency, is computed based on 2.02 and 2.03, which Claimant did not meet. R. 49.

While reviewing Claimant's available medical history and questioning Claimant, the ME expressed surprise that Claimant did not receive more medical attention for his eye condition and stated that, Claimant has "been casual about taking care of his eyes." R. 45-46, 50.

The ME refused to answer any questions about Claimant's other sarcoidosis symptoms, stating "I'm not prepared to answer anything about his joints . . . or his lungs" because those topics are outside her field of expertise. R. 54. The ME acknowledged that headaches are possible symptoms of sarcoidosis affecting other organs of the body, including

the brain.  R. 51, 55.  The ME speculated that she would expect Claimant's visual acuity to improve with better medical treatment, though noted it is difficult to predict.  R. 59, 62.  The ME classified Claimant's residual functional capacity ("RFC") as light to medium, but clarified that her opinion only referred to Claimant's eyes, and did not take "into account the x-rays or the lungs or the joint pain," because that is outside her expertise  R. 60-63.

As far as appropriate limitations identified by the ME, the Claimant should not work at a computer for eight hours per day or work with microscopes, and he would have difficulties with jobs that require extensive reading.  R. 60-61.

### 3.  Mr. Frank Mendrick – Vocational Expert ("VE")

Frank Mendrick testified as a vocational expert.  The VE described Claimant's past work, classifying (1) his janitorial work as semi-skilled, medium work; (2) his housekeeping work as unskilled, medium work; (3) his laundry work as unskilled light or medium work; and (4) his unarmed security guard work as unskilled, light work.  R. 67-68.

The ALJ asked the VE whether a thirty-seven year old individual with a high school education and the same past relevant work experience as Claimant who has the RFC to perform work at the light exertional level but with no distance vision requirement, no exposure to cold, respiratory irritants, or hazardous equipment, and no need to climb ladders or work on unstable surfaces, could perform Claimant's past relevant work.  R. 69.  The VE responded that the hypothetical person could not perform the janitorial or housekeeping work, but could perform the laundry or unarmed security guard work.  R.  70.  The VE then listed other occupations the person could perform at the light level, including 5,000 office

cleaner positions, 3,500 inspection positions, and 5,000 hand labor positions in the Chicago metropolitan area.  R. 71.

For a similar hypothetical person, but further restricted to only sedentary work, the VE stated that some jobs existed in the economy, although the person could not perform any of  Claimant's past relevant work.  R. 70.  The VE listed 3,500 assembly positions, 1,200 inspection positions, and 2,000 hand labor positions in the Chicago metropolitan area at the sedentary level.  R.70-71.

The VE then noted, however, that all of the jobs listed for either the light or sedentary level would require frequent or constant use of the eyes including "accommodation, the ability to focus at different times at different distances."  R. 72, 73.  The VE stated that a person who was limited to less than frequent use of the eyes would be unable to perform any of the listed jobs at either level.  R. 75.  Furthermore, a person who was distracted by "headaches and visual problems" such that he was off task more than twenty percent of the time would be unable to successfully perform the listed jobs.  R. 75-76.  A person who "due to joint pain would be limited to occasional use of the hands for fine and gross manipulations" would be similarly unable to perform the jobs.  R. 76.  Finally, the VE noted that a person who needed to occasionally shift to a reclined or horizontal position could not perform any of the listed jobs at the light or sedentary levels.  R. 76-77.

C.    **Medical Evidence**

1.    **University of Illinois at Chicago Medical Center - February 18, 2006**

Claimant presented to the University of Illinois at Chicago ("UIC") emergency room

on February 18, 2006, complaining of decreasing vision over the past three years.  R. 294, 302.  A chest x-ray performed the next day recorded findings "suggestive of sarcoidosis." R. 296.  Claimant was examined the same day at the UIC outpatient ophthalmology clinic, where the doctor diagnosed uvetis, likely caused by sarcoidosis.  R. 298-300, 306-07.

### 2. Dr. Liana R. Palacci - State Agency Physician

Dr. Liana R. Palacci ("Dr. Palacci"), an osteopath, examined Claimant on January 26, 2007.  R. 278-81.  At that time Claimant's vision was 20/50 in his right eye and 20/70 in his left eye.  R. 279.  His extremities showed no abnormalities and his range of motion in his fingers and wrists was normal, as was his grip.  R. 279-80.  Claimant complained of shortness of breath when walking more than three blocks, although his lungs appeared to be clear on examination; Dr. Palacci noted the "chest x-ray revealed sarcoidosis" and diagnosed well-controlled sarcoidosis.  R. 278-80.

### 3. Dr. Mark Buranosky - State Agency Physician

Dr. Mark Buranosky ("Dr. Buranosky"), an ophthalmologist, examined Claimant on June 20, 2007. R. 310. At that time Claimant's vision was 20/100 in his right eye and 20/200 in his left eye. *Id.* Dr. Buranosky diagnosed bilateral granulomatous uveitis with mild to moderate cataracts, noting that Claimant's "visual acuity is limited and he likely will require long term management of his ocular inflammation." *Id.* Dr. Buranosky noted that Claimant is "not currently on any ophthalmic medications." *Id.*

### 4. Dr. Richard Bilinksy and Dr. Frank Norbury - State Agency Reviewing Physicians

Two state agency doctors reviewed Claimant's medical records. Dr. Richard Bilinsky ("Dr. Bilinsky"), an internist specializing in nephrology, reviewed Claimant's records in February 2007. R. 285-92. Dr. Bilinsky diagnosed well-controlled sarcoidosis. R. 292. Dr. Bilinsky opined that Claimant could perform most work at the medium exertional level, so long as good far visual acuity or exposure to concentrated respiratory irritants was not required. R. 286-89.

Dr. Frank Norbury, an internist, reviewed Claimant's record in July, 2007 and agreed with Dr. Bilinsky's opinion. R. 312-14.

### 5. Visits to Stroger Hospital and Fantus Health Center

Claimant's subsequent medical records begin in 2008. A chest x-ray of Claimant from Stroger Hospital ("Stroger") on February 4, 2008 showed findings suggesting sarcoidosis. R. 325. Claimant was examined in Stroger's Fantus pulmonary clinic on February 14, 2008.

R. 324. The chart from that visit referenced a chest x-ray from November 2007 that was suggestive of sarcoidosis, and notes that Claimant's symptoms include a daily cough, skin rash, and swelling in the right hand with swollen fingers. R. 324.

Claimant was then examined in the Fantus eye clinic on March 7, 2008, where he complained of intermittent pain in his eyes and reported that he had been using steroid eye drops. R. 346. Claimant was also examined in the Fantus dermatology clinic on March 10, 2008, where the doctor noted a history of abnormal growths on Claimant's nose and forehead over the past couple of months. R. 347. A skin biopsy was performed on March 11, 2008. R. 322-23. The report notes a clinical "history of violaceous papules paranasally for a few years," and a preoperative/postoperative diagnosis of sarcoidosis. R. 323.

Claimant next had a pulmonary function test performed at Fantus clinic on March 24, 2009. R. 318-21. Dr. Bassem Srour examined Claimant in the Fantus pulmonary clinic on March 27, 2008. R. 316, 344. Dr. Srour diagnosed "systemic sarcoid with eye, skin, [and] joint involvement," and noted some swelling in the finger joints and some joint deformity. R. 316. Dr. Srour noted that Claimant's vision had improved in the right eye; his "skin rash is clearing up"; "his hands are much better after steroids[,] now he can make a fist"; and "now he can walk one and a half block[s] before he needs to stop." *Id.* Claimant followed up with the Fantus dermatology clinic on March 31, 2008, where the doctor noted that Claimant's sarcoidic condition included eye, joint, lung, and skin involvement and prescribed a number of medications. R. 345.

Claimant was then examined in the Fantus arthritis clinic on May 2, 2008. R. 330-31,

343. The chart notes that Claimant had decreased vision over the last year and small joint pains and deformities over the last six months. R. 343. X-rays taken of Claimant's hands the same day showed "changes consistent with sarcoidosis," including "multiple lytic lesions" and deformities. R. 332. Claimant was again seen in the Fantus arthritis clinic on June 6, 2008. R. 340-42. The doctor referred Claimant to the ophthalmology and rheumatology clinics and prescribed more medication; Claimant had apparently run out of medicine two months earlier. R. 340.

**D.    The ALJ's Decision - April 16, 2009**

Following a hearing and review of the medical evidence, the ALJ rendered a decision partially favorable to Claimant. R. 93-108. The ALJ found that Claimant was not disabled as of December 31, 2007, the date last insured, and upheld the denial of DIB. R. 108. The ALJ found Claimant disabled beginning February 1, 2008 and awarded SSI benefits. R. 108.

The ALJ evaluated Claimant's application under the required five-step analysis. R. 94-108. At step one, the ALJ found Claimant has not engaged in substantial gainful activity since May 1, 2006, the alleged onset date. R. 96. At step two, the ALJ determined that Claimant has the severe impairment of sarcoidosis. R. 96. At step three, the ALJ found Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. 96-97. The ALJ then considered Claimant's residual functional capacity ("RFC") and found prior to February 1, 2008, Claimant was capable of performing a wide range of unskilled medium work as he could lift, carry, push and or pull up to fifty pounds occasionally and twenty-five

11

pounds frequently and could sit and stand through a normal workday with typical breaks; he would have been limited to not climbing ladders, ropes, or scaffolds and not working on moving surfaces, he could not perform work that required good far visual acuity, nor could he be exposed to extreme cold, concentrated respiratory irritants, unprotected heights or unguarded hazardous equipment. His symptoms would only rarely distract him and the record did not show that Claimant was limited in his ability to use his hands for fine and gross manipulation of objects prior to that date. R. 98.

The ALJ then discussed Claimant's RFC after February 1, 2008. R. 105. The ALJ concluded that Claimant can perform some light and sedentary work. He can lift, carry, push, and/or pull up to twenty pounds occasionally and up to ten pounds frequently; he can sit, stand and/or walk throughout a normal workday with typical breaks. He should not be asked to climb ladders, ropes or scaffolds or work on moving or unstable surfaces, and he cannot perform work that requires far visual acuity. He should not be exposed to extreme cold, concentrated respiratory irritants, unprotected heights or unguarded hazardous equipment. His symptoms would only rarely distract him outside of normal break time. The ALJ then found that Claimant is limited in his ability to use his hands more than occasionally for fine and gross manipulation of objects. R. 105-06.

In assessing Claimant's credibility, the ALJ found that his medically determinable impairments could reasonably be expected to produce the alleged symptoms, but his statements concerning the intensity, persistence and limiting effects of these symptoms were not fully consistent with, nor well supported by, the objective medical and other evidence for the period prior to February 1, 2008. R. 104. Further the ALJ found that some of Claimant's testimony was not consistent with his statements to treating physicians. R. 105. The ALJ noted other factors that adversely affect Claimant's credibility. *Id.*

The ALJ gave the greatest weight to Dr. Torczynski because she is an ophthalmologist, had access to all of Claimant's records, and observed Claimant during the hearing. R. 102. The ALJ noted that the opinions of the state agency physicians were consistent with the RFC conclusion prior to February 2008, but she gave those opinions less credit after February 2008 because there was additional objective evidence of medical treatment after that date. R. 102.

At step four, the ALJ found that prior to February 1, 2008, Claimant was able to perform his past relevant work. R. 106. Beginning February 1, 2008, however, there are not a significant number of jobs that exist in the national economy that Claimant could perform. R. 106-07. Thus, the ALJ concluded that Claimant was not disabled within the meaning of the Social Security Act through December 31, 2007, the date last insured. R. 107-08. The ALJ further found that Claimant became disabled on February 1, 2008 and continued to be disabled through the date of the decision. R. 107.

**E.      Post-Hearing Correspondence**

After the hearing, the ALJ held the record open for additional medical evidence. R. 93. The ALJ secured records from the Fantus clinic pharmacy and Claimant's attorney secured progress notes of Claimant's treatment after February 2006. *Id.* Following the hearing, Claimant's attorney wrote to the ALJ and argued that the ME was unable to make an opinion on whether Claimant equaled a listing due to his sarcoidosis and eye impairment. R. 262-63. Claimant's attorney requested, due to the additional evidence, that the ALJ hold a supplemental hearing to determine whether Claimant meets or equals a listing. *Id.* The ALJ determined that a supplemental hearing was not necessary because "the objective medical evidence shows that Claimant's combined impairments are not, and have not been, so severe as to medically meet or equal a listed impairment." R. 93-94.

## II. LEGAL STANDARDS

### A.    Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commission's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* The reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420,

28 L. Ed. 2d 842 (1971). A "mere scintilla" of evidence is not enough. *Id.*; *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when the record contains adequate evidence to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or an adequate discussion of the issues, it must be remanded. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the findings. *Id.*

## B.    Disability Standard

Disability insurance benefits are available to a claimant who can establish he is under a "disability" as defined by the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to perform his previous work

and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id*. Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the ALJ must determine whether other jobs exist in the economy that the claimant can perform. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

### III. DISCUSSION

Claimant raises two issues for judicial review: (1) whether the ALJ erred in not soliciting medical expert testimony to infer the onset date of Claimant's disability and determine whether Claimant's impairments in combination medically equal a listed impairment; and (2) whether the ALJ improperly evaluated the credibility of claimant's testimony.

**A.      The ALJ Erred by Failing to Solicit Medical Expert Testimony Concerning Claimant's Hand Impairment.**

1. **The ALJ Committed Legal Error by Failing to Solicit Additional Medical Expert Testimony to Infer the Onset Date of Claimant's Hand Disability as Required under Social Security Ruling 83-20.**

The first issue is whether the ALJ properly selected February 1, 2008, as the onset date rather than a date on or before December 31, 2007. The onset date is especially important in this case because Claimant's date last insured—the last day he qualified for DIB—was December 31, 2007, only 32 days prior to the onset date identified by the ALJ.

The first issue is whether the ALJ properly followed Social Security Ruling ("SSR") 83-20. The purpose of SSR 83-20 is to "state the policy and describe the relevant evidence to be considered when establishing the onset date of disability . . . ." SSR 83-20, 1983 WL 31249. In many cases, the onset date is critical, and "it is essential that the onset date be correctly established and supported by the evidence. . . ." *Id.* at *1. For disabilities of non-traumatic origin [such as Claimant's], the onset date must be determined by considering the claimant's allegations, the claimant's work history, and the medical and other evidence concerning the severity of the impairment. *Id.* at *2.

The onset date alleged by a claimant is the starting point for determining an onset date. *Id.* That date "should be used if it is consistent with all the evidence available." *Id.* at *3. That date is then adjusted by considering the claimant's work history, and then further adjusted in light of medical evidence describing examinations or treatment of the claimant. *Id.* Medical evidence is "the primary element in the onset determination." *Id.* However, the claim does not fail for lack of medical evidence establishing the precise date the impairment became disabling. *Lewis v. Astrue*, 518 F. Supp.2d 1031, 1040 (N.D. Ill. 2007).

SSR 83-20 recognizes that precise evidence of the onset date may not be available and an inference may be required, particularly with progressive impairments. SSR 83-20, 1983 WL 31249, at * 2. In these cases, the ALJ must give a "convincing rationale" for the onset date selected. *Id.* at *3. That date should be the date "when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in substantial gainful activity" for at least twelve months. *Id.* How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. *Id.* Critical to Claimant's argument is that SSR 83-20 explicitly states: "This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred." *Id.*

In the case at bar, the medical evidence does not reveal a precise date when the hand impairments resulting from Claimant's sarcoidosis became disabling. Thus, the ALJ should have called on a medical expert to assist in determining the onset date. At the hearing, the ALJ acknowledged that she knows very little about sarcoidosis. R. 49. Without the input from a medical expert other than the ophthalmologist, the ALJ selected February 1, 2008, as the onset date. She concluded that Claimant did not "seek or need," medical treatment for his sarcoidosis between February 2006 and February 2008, at which point Claimant "promptly sought treatment after that exacerbation." R. 105, 108. The ALJ found that the most significant change between 2006 and 2008 was the impact on his hands, but the record did not show a significant impairment of either hand prior to February 2008. R. 108.

The ALJ is correct that there is a dearth of medical evidence between when Claimant saw the state agency doctors (osteopath Dr. Palacci in January 2007 and ophthalmologist Dr. Buranosky in July 2007) and when he resumed treatment in February 2008. Claimant does not contest that his hands were not swollen when he saw the state agency doctor (though it is unclear whether this testimony refers to Dr. Palacci or Dr. Buranosky). R. 40. He did testify, however, that his hand condition was worse at the time of the hearing than it was in 2006, specifying that his fingers had started to "form over and swell up," have "started to bend" and "another finger [has] started on clubbing." R. 39-40. He appears to have told a doctor in May 2008 that six months earlier he was experiencing small joint pain and joint deformities. R. 343.

The question for the ALJ then was when, between July 2007 and February 2008, Claimant became disabled. The ALJ conscientiously sought to answer this question on the record before her without a doctor's input. While doctors treated Claimant's impaired hands in February 2008 for the first time, there is no medical evidence in the record to pinpoint when Claimant's hand actually became disabling, nor is there medical testimony about the progressive nature of sarcoidosis on organs or joints other than the eyes. *See Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (noting that SSR 83-20 does not require an impairment to reach severity and that the onset date is that date on which the impairment became severe enough to prevent the claimant from engaging in SGA for at least twelve months). Neither SSR 83-20 nor the case law sanction the ALJ's decision not to call upon a doctor to provide medical input on this crucial question. Moreover, the Seventh Circuit

19

long ago clarified that "the critical date is the *onset* of disability, *not* the date of diagnosis" and SSR 83-20 prevents an ALJ from relying on the first date of diagnosis solely because an earlier diagnosis date was not available. *Lichter v. Bowen*, 814 F.2d 403, 435 (7th Cir. 1987).

Courts in this district have recently applied this principle. For example, in *Brothers v. Astrue*, No. 06 C 7088, 2011 WL 2446323 (N.D. Ill. June 13, 2011), there was a gap of one year in the medical evidence in the record. The claimant in that case was evaluated by a doctor following the ALJ hearing. *Id.* at *4. The ALJ gave significant weight to that doctor and decided to set the onset date as six months prior to the evaluation. *Id.* at *7. After reviewing the plain language of SSR 83-20, the court noted "While the Seventh Circuit does not require a consultation if the medical evidence of record is 'complete' the exception is inapplicable here." *Id.* at * 10 (citation omitted). Despite the fact that the sparse record was attributable to the claimant's "lack of diligence" in seeking medical case, the "fact remain[ed] that absent a complete record, the ALJ is not permitted to forego the assistance of a medical advisor." *Id.*

The Commissioner argues that the ALJ was not required to obtain testimony from a medical expert because there was no objective evidence that Claimant's condition was declining prior to December 31, 2007, his date last insured. However, sarcoidosis is a progressive disease. As a result of his sarcoidosis, Claimant's vision was deteriorating and he began experiencing small joint pain and joint deformities before he went to the doctor in February 2008. R. 343. Claimant testified that he did not seek treatment before that time

because he lacked financial resources. The plain language of SSR 83-20 requires medical testimony when an onset date must be inferred in the absence of a clear medical record.

The case cited by the Commissioner, *Thomas v. Astrue*, 352 Fed. App'x 115 (7th Cir. 2009), is helpful but distinguishable. *Thomas* makes clear that SSR 83-20 does not shift the burden of proof away from a claimant to establish an onset date, nor does it make it compulsory for an ALJ to obtain additional evidence on his or her own. *Id.* at 116. However, in that case there was no medical evidence for three to four months prior to the claimant's date last insured—a smaller gap than in the case at bar—and the most recent medical evidence prior to the date last insured found the claimant to be asymptomatic. *Id.* at 116. Courts in this district understand *Thomas* to stand for the proposition that the worsening of a claimant's condition after the date last insured is not a basis for granting benefits. *Mackay v. Astrue*, 2011 U.S. Dist. LEXIS 147189, at *35 n.8. (N.D. Ill. Dec. 22, 2011); *Rubio v. Astrue*, 2011 U.S. Dist. LEXIS 94678, at *26-*27 (N.D. Ill. Aug. 24, 2011). In this case, however, there is clear evidence that Claimant's sarcoidosis was diagnosed two years prior to the date last insured. Additionally, there is evidence that his hand condition worsened before the date last insured as records from May 2008 indicate small joint pain and joint deformities going back six months. R. 343.

The Commissioner also contends that the ALJ's decision was supported by the opinions of Dr. Balinsky, Dr. Norbury, and Dr. Torczynski. However, Dr. Balinsky and Dr. Norbury reviewed Claimant's medical record, but did not physically examine Claimant, in February and July of 2007. Moreover, Dr. Torczynski—whose testimony the ALJ assigned

the most weight—is an eye specialist and is not qualified to give expert testimony regarding the limiting effect of sarcoidosis on other body systems. The ALJ clearly stated that Dr. Torczynski "properly limited her testimony [during the October 2008 hearing] to [Claimant's] visual impairment." R. 93. Thus, the ALJ cannot properly rely on Dr. Torczinski's testimony to support her onset date determination concerning Claimant's hand impairment.

Thus, the ALJ committed legal error by failing to follow SSR 83-20 in determining the onset of Claimant's disability. Both the ALJ and Claimant's counsel knew that the date last insured would be an issue and that the record contained a gap in medical evidence, though neither brought out the requisite expert testimony. The Court acknowledges that the ALJ's selection of the February 1, 2008, onset date was not unreasonable from the perspective of a layperson. However, making that inference was simply outside of her province. No objective medical evidence clarifies the actual date when Claimant's hand impairment from sarcoidosis became disabling and therefore, the ALJ was required to seek input from a doctor on this crucial issue. On remand the ALJ should elicit medical expert testimony regarding the impact of Claimant's sarcoidosis on his hand joints and when the condition became disabling pursuant to SSR 83-20.

### 2. In Light of the Remand, the ALJ Should Consider Whether Claimant's Impairments in Combination Medically Equal a Listed Impairment.

Claimant also contends the ALJ erred in not soliciting additional medical expert testimony to determine whether Claimant's impairments meet or equal a listed impairment

based on evidence submitted after the hearing. After the October 2008 hearing, the ALJ briefly held the record open for additional medical evidence. Claimant's counsel submitted additional medical evidence during this period and requested a supplemental hearing in light of the additional evidence and his belief that Dr. Torczinksi was unable make an opinion on whether Claimant's combined impairments equal a listed impairment. R. 262. The ALJ denied Claimant's request, stating that Dr. Torczinski "properly limited her testimony to the visual impairment" and "that the objective medical evidence shows that Claimant's combined impairments are not, and have not been, so severe as to medically meet or equal a listed impairment . . . ." R. 93-94.

Social Security Ruling 96-6p requires an ALJ to "obtain an updated medical opinion from a medical expert . . . when additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's findings that the impairment is not equivalent in severity to any impairments in the Listing of Impairments." SSR 96-6p, 1996 WL 374180, at *3-4. In arguing that this ruling required the ALJ to elicit medical testimony, the Court believes Claimant reads SSR 96-6p to be more expansive than it actually is. Social Security Ruling 96-6p only mandates an updated opinion when the ALJ determines that the additional medical evidence may change the opinion of the state agency doctors. Contrary to Claimant's position, the ALJ was not required under 96-6p to solicit an updated medical opinion simply because he submitted new evidence.

While the ALJ is responsible for deciding the ultimate legal question of whether a listing is met or equaled, *Cirelli*, 751 F. Supp.2d at 1002, the issue of "[w]hether a claimant's

impairment equals a listing is a medical judgment, and the ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). The ALJ properly analyzed Dr. Torczynski's testimony to determine that Claimant does not meet the listings related to visual impairment. R. 97. However, the ALJ did not have an expert opinion on Claimant's other impairments. While this issue alone does not warrant a remand, in light of additional medical testimony to be solicited on remand, the ALJ should use that information to revisit whether Claimant's impairments in combination meet or medically equal a listing.

**B.    The ALJ Properly Evaluated the Credibility of Claimant's Testimony.**

Claimant further contends the ALJ improperly discredited his allegations of disabling hand pain as a symptom of his sarcoidosis. "Because the 'ALJ is in the best position to determine the credibility of the witness,' the Court reviews that determination 'deferentially,' and will overturn a credibility determination 'only if it is patently wrong.'" *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining whether a credibility determination is "patently wrong," the Court examines whether the ALJ's determination was reasoned and supported. *Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2003). The ALJ needs only to "minimally articulate his or her justification for rejecting or accepting specific evidence of disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). However, the ALJ may not ignore the claimant's statements regarding pain and other symptoms or disregard them merely because they are not substantiated by subjective medical evidence. SSR 96-7p, 1996 WL 374186, at *1 (S.S.A.).

In this case, the ALJ determined that "[C]laimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms." R. 105. However, the ALJ nonetheless discredited Claimant's hand pain allegations primarily because Claimant's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully consistent with nor well supported by the objective medical or other evidence for the period prior to [the established onset date of] February 1, 2008." R. 104. The ALJ further stated that after February 1, 2008, "the claimant's allegations regarding his symptoms and limitations are somewhat better supported by the objective medical

25

evidence and therefore more credible."  R. 105.

The fact that Claimant's pain allegations are not supported by objective medical evidence is, alone, insufficient to discredit his testimony.  *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("The ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it."). However, the ALJ in fact raised several additional credibility concerns; the Court finds the reasons articulated by the ALJ are collectively sufficient to uphold her credibility findings.

First, the ALJ properly raised a number of inconsistencies between Claimant's testimony at the hearing and previous statements to his treating physicians.  R. 105; SSR 96-7p (explaining that ALJs look to the consistency of a claimant's own statements when evaluating credibility).  For instance, while Plaintiff testified that his medications helped his hands "a little," R. 26., he told physicians at the Stroger Fantus Pulminary Clinic in March 2008 that his hands were "much better after steroids."  R. 100, 328.

Additionally, while Claimant told a physician in February 2008 that he last used cocaine in December 2007, he testified at his October 2008 hearing that he last used cocaine "about what, two, a year, year and a half, two years maybe."  R. 29.  While the exact time frame identified by Claimant is not entirely clear, the ALJ reasonably interpreted the testimony as Claimant stating he used cocaine eighteen months ago.  Even if understood to be a year ago, it is still not consistent with his statement to the physician.  As such, Claimant's testimony—whether indicating cocaine use two years prior (October 2006),

eighteen months prior (April 2007), or one year prior (November 2007)—did not match his previous report to a physician that he last used cocaine in December 2007. *Id.*

The ALJ further called into question the timing of Claimant's disability claim and his collection of employment disability benefits during the period of his alleged disability. As the ALJ points out, Claimant was diagnosed with sarcoidosis in February 2006, yet he continued working until May 1, 2006, when his employer fired him for reasons not related to disability. R. 105. Although Claimant proceeded to claim a disability onset of May 1, 2006—the day he was fired—he nonetheless sought and received unemployment benefits for six months thereafter. *Id.* The ALJ noted that by collecting unemployment benefits Claimant was certifying himself as able to work. *Id.*

In sum, the ALJ's credibility findings were supported by inconsistencies in Claimant's testimony and questions regarding the timing of his disability claim. The ALJ clearly articulated her credibility findings and supported those findings with reasoned analysis. Thus, Plaintiff has not shown that the ALJ's credibility finding was "patently wrong" and the Court therefore upholds those findings as supported by substantial evidence.

## IV. CONCLUSION

For the reasons set forth in this opinion, the Court grants Claimant's motion for summary judgment to reverse and remand the decision to the Commissioner, denies the Commissioner's motion to affirm the Commissioner's decision, and remands the case to the Commissioner for further proceedings consistent with this opinion.

**SO ORDERED THIS 14th DAY OF FEBRUARY, 2012.**

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

Barry A. Schultz
Cody Marvin
Law Offices of Barry A. Schultz, P.C.
1601 Sherman Avenue
Suite 510
Evanston, Illinois 60201

**Counsel for Plaintiff**

Harpreet K. Chahal
Assistant United States Attorney
219 South Dearborn Street
Suite 500
Chicago, Illinois 60604

David Levitt
Assistant Regional Counsel
Social Security Administration
200 West Adams Street
Suite 3000
Chicago, Illinois 60606

**Counsel for Defendant**